## **AFFIDAVIT FOR SEARCH WARRANT**

I, Robert Jacobsen, Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives, being duly sworn, state as follows:

### **INTRODUCTION**

1.  I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since November 2017. I received 15 weeks of Criminal Investigator training at the Federal Law Enforcement Training Center and 17 weeks of ATF Special Agent training at the ATF National Academy. I was trained in federal criminal law, firearms, and criminal investigation techniques.

2.  Since joining ATF, I have investigated violent crime and federal firearms violations, which has included participating in the controlled purchases of firearms; interviews of suspects; participating in executing search warrants and conducting electronic surveillance; and analyzing firearms trace data. I have investigated criminal gang organizations and the violent crime associated with those gangs.

3.  Prior to my employment with ATF, I was employed for approximately two-and-one-half years as a Deputy Sheriff with the Loudoun County Sheriff's Office in Loudoun County, Virginia. For approximately the last year of that employment I operated as a member of the Special Operations Unit, which is a full-time SWAT team and Street Crimes Criminal Suppression Unit. I was trained and certified by the Columbus Police Department as a SWAT operator and hold numerous training certificates in domestic and foreign weapon systems, street crimes, criminal narcotics operations, and gang organizations. Prior to joining the Special Operations Unit, I spent

1

approximately one-and-one-half years in a patrol function, responding to public emergency calls for service, investigating crimes, and testifying in court. I graduated from the Northern Virginia Criminal Justice Academy with Virginia state certifications as a Police Officer and Jail Corrections Officer. I received a Bachelor of Science Degree from George Mason University.

4. I am submitting this affidavit in support of an application for a warrant to search electronic equipment, specifically a cellular phone (the "COUSIN PHONE" or the "equipment") that is in the possession of law enforcement investigators, as described in Attachment A. There is probable cause to believe that the equipment contains evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1951, which, among other things, prohibits conspiracy to commit robbery affecting interstate or foreign commerce, and Title 21, United States Code, Sections 846 and 841(a)(l) and (b)(1)(A)(ii), which, among other things, prohibit conspiracy to distribute and to possess with the intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine.

5. I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in the investigation; (b) my discussions with fellow agents and state/local law enforcement personnel who assisted in the investigation; (c) interviews of witnesses; (d) my review of reports; and (e) my experience and training as a criminal investigator. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the requested search warrant, I have not set forth every fact learned during the course of the investigation.

## BACKGROUND

6.   In October of 2019, ATF Confidential Informant #27698, who is a cooperating witness ("CW"), provided me with information regarding Keith COUSIN.[1] The CW advised that COUSIN is a member of the Columbia Road street gang who was recently released from jail, having been charged with murder and found not guilty based on a judicial finding of insufficient evidence in May of 2019. The CW informed me that COUSIN was actively requesting that people locate drug dealers with stash-houses in possession of money and narcotics, and to report back to COUSIN with the information.

## PROBABLE CAUSE

7.   My investigation into COUSIN corroborated the information provided by the CW, in that COUSIN is a documented member of the Columbia Road street gang. The Columbia Road street gang uses clothing, colors, and symbols to represent the gang. Like other members of the gang, COUSIN bears a "CR" tattoo. According to the Boston Regional Intelligence Center ("BRIC"), there are forty verified members and associates of the gang. Boston Police Department ("BPD") verifies gang members and has verified COUSIN as a member of the Columbia Road street gang. Investigation into COUSIN and other members of the Columbia Road gang show a long and violent history of firearms and armed robbery crimes. COUSIN was first arrested by BPD in 2000 as a juvenile for armed robbery and has been arrested on 34 charges since then.

---

[1] The CW has a criminal history that includes prior firearm and drug distribution convictions. On previous occasions, the CW has accurately identified and corroborated events and individuals involved in active criminal investigations. At the direction of law enforcement, the CW has conducted controlled purchases of evidence in conjunction with criminal investigations. The CW is being paid for her/his services and information provided.

8. Further investigation into COUSIN corroborated the CW's intelligence that COUSIN has a long history of committing robberies and violent acts. A records check of COUSIN's criminal history, as maintained by the Massachusetts Board of Probation, includes 2010 convictions for possession of a firearm and possession of ammunition, a 2008 conviction for assault and battery with a dangerous weapon, and a 2005 conviction for possession of a firearm. COUSIN also has a 2003 juvenile adjudication for possession of a firearm, 2002 juvenile adjudications for armed robbery and assault with a dangerous weapon, 2001 juvenile adjudications for breaking and entering at night with intent to commit a felony and larceny, and another 2001 juvenile adjudication for unarmed robbery. In addition to the aforementioned criminal convictions and juvenile adjudications, COUSIN has been arrested numerous other times for firearms, robbery, and drug offenses, among other crimes.

9. The CW further explained that COUSIN was recently casing potential targets for robberies. Based on my training and experience, I know the term "casing" to refer to taking measures to determine the worthiness of a target prior to conducting a robbery and to plan the methods for carrying out such a robbery. The CW explained that COUSIN was actively requesting that people locate drug dealers who possess, control, or store money and/or narcotics at particular locations – often known as "stash houses" – and to report back to COUSIN with the information. The CW further explained that, as recently as October 2019, she/he was requested by COUSIN to make such a phone call by attempting to contact a third party to seek information related to a potential stash house. Based upon the CW's description of COUSIN's conduct, and based on my training and experience and my familiarity with COUSIN's criminal history and gang activity, I believe that COUSIN was actively seeking targets for robberies involving drugs, drug dealers, and/or drug proceeds.

4

10. On October 20, 2019, BPD responded to a home invasion involving four black males who forced their way into a residence with firearms and zip-tied the occupants, including children and elderly persons. One suspect made several threats to shoot one of the victims in front of his kids, while another suspect collected the victims' cell phones. Wearing latex gloves, the males were in the process of taking cell phones and smart watches away from the victims when officers arrived at the residence. Two suspects were arrested and two fled the scene. Three firearms were recovered from the suspects at the residence. According to BPD detectives, the description provided for one of the fleeing suspects matches the description of COUSIN, including a detailed account of a chipped tooth, consistent with a chipped tooth that COUSIN has.[2]

11. On November 26, 2019, I met with the CW. At the direction of law enforcement, the CW agreed to make a recorded phone call to Keith COUSIN to initiate a conversation regarding COUSIN's interest in participating in a potential robbery plan. The CW called COUSIN at number (857) 346-5716. COUSIN answered the call and explained to the CW that he did not want to talk over the phone and asked the CW to call back from the FaceTime video chat application. I initiated an audio recording device to record the audio conversation between COUSIN and the CW while they communicated over FaceTime video chat. The CW then initiated a FaceTime call with COUSIN, and COUSIN answered the call.

---

[2] The CW described COUSIN as having a chipped tooth. A BPD detective familiar with COUSIN corroborated this description. Based on the independent corroboration of certain information that the CW has provided about COUSIN, I believe that this information — and other information provided by the CW regarding COUSIN — is reliable.

.12. The CW told COUSIN that she/he had "a quick scheme" and told COUSIN, "I need somebody man." The CW then admitted to COUSIN, "I know we're not on good terms" but explained that this situation involved money, referring to money as "bread." COUSIN asked the CW, "Like what?" The CW answered, "Like a come up," referring to the potential for a robbery. COUSIN responded by asking the CW, "What made you call me out of all people, knowing that we ain't on good terms?" The CW answered, "Because I know what you do. . ." COUSIN responded, "I know." COUSIN and the CW then began to discuss their past. COUSIN then asked the CW more about the robbery information. The CW told COUSIN that her/his people were coming into town and "fuckin' with some n****s." COUSIN then stopped the CW and explained he was with his people and that he would call the CW back on FaceTime at a later time to "really chop it up, and really have a heart to heart."

13. On November 27, 2019, the CW informed ATF that she/he had received a FaceTime video call from COUSIN, who was inquiring for more information regarding the previously discussed robbery plan. I subsequently interviewed the CW about the details of that video phone call. The CW told me that COUSIN told the CW that he could not stop thinking about what they discussed during their previous phone call regarding a potential robbery, and that he wanted more details. The CW further explained that COUSIN made the unprompted statement, "If you got this lick for us, let's do it." Based on my training and experience, and that of other agents, I know the term "lick" to be a common slang term used for a robbery. At the direction of law enforcement, the CW explained to COUSIN that she/he knew people from out of state who would be coming into town and had "something good lined up." The CW further explained that these people had done this

before a couple years ago and it worked out very well, referring to a robbery. The CW also mentioned that it should work out well this time.

14. On December 17, 2019, the CW was directed by law enforcement to call COUSIN and attempt to confirm a time of day for a planned controlled meeting between the CW and COUSIN. In substance and among other things, the conversation included the following. The CW told COUSIN that she/he wanted to discuss what they had previously spoken about in prior conversations, alluding to discussions about participating in a robbery. COUSIN told the CW that he understood the nature of the topic and asked for more details. The CW told COUSIN that things were falling into place for the robbery and attempted to arrange for an in-person meeting to discuss further details. COUSIN asked the CW how she/he knew the person who was to be planning the robbery. The CW provided a prepared narrative, at the direction of law enforcement, regarding their relationship. The CW explained that the person "had beef" with some of her/his own people and was planning to rob them. COUSIN then attempted to seek further information regarding the possible fruits of the robbery. COUSIN said to the CW, "So it's like a double-cross," and then stated, "That's going to be like taking candy from a baby."

### Introduction of ATF Undercover Agent and Initial Meeting with Keith COUSIN

15. On January 7, 2020, Special Agent ("SA") Valles, acting in an undercover capacity (the "UC"), met with COUSIN in a vehicle being driven from Logan Airport to a hotel in Boston, Massachusetts. The purpose of this meeting was to ascertain COUSIN's interest in committing an armed robbery of a narcotics stash house. The CW was also present at this meeting as she/he was responsible for making the introduction between COUSIN and the UC.

16. In substance and among other things, the conversation included the following. The UC explained to COUSIN that he was a disgruntled cocaine courier who works for a Mexican-based Drug Trafficking Organization ("DTO") that was seeking to expand its operations to the New England area. The UC stated that the DTO maintained "stash houses" containing "quality cocaine." The UC then explained that he was responsible for transporting two (2) kilograms of cocaine for the DTO. COUSIN acknowledged that he understood what the UC had said by stating, "Oh, so you're the courier." The UC affirmatively acknowledged that COUSIN was correct.

17. The UC then explained that every time he has collected cocaine at a stash house, the UC observed at least ten (10) "kilos" of cocaine. The UC stated that every time he entered a stash house, the same two guards were always present at the residence, one of whom was always armed with a "pistol on his hip." COUSIN then stated, "Play it like they both got guns" and directed the UC to continue explaining. The UC then explained that after he entered a stash house one of the guards would retrieve two (2) kilos from a back room, hand them to the UC, and then provide the UC with the destination location.

18. The UC went on to explain that the DTO had not provided payment to the UC for the last two (2) occasions on which the UC had transported the kilos of cocaine, and indicated that was the reason the UC was looking for someone to rob the stash house. Additionally, the UC advised that this would be the first time he would be conducting a transport for the DTO in this area, and indicated that he was also disgruntled because the DTO was making him come all the way to the Boston area from El Paso, TX. COUSIN affirmatively acknowledged that he understood what the UC had said.

19. COUSIN told the UC that he could have not picked someone better (than himself) to conduct the robbery. COUSIN further stated that he understood he was dealing with people whom "the cartel entrusted to watch they drugs" and that there would definitely have to be some type of "hostile takeover."

### Second Undercover Meeting, with Keith COUSIN and Rico PERRY

20. On January 8, 2020, the UC and the CW met COUSIN and another individual at a hotel in Boston. That person introduced himself to the UC as "E" and has since been identified as Rico PERRY.

21. In substance and among other things, the conversation that took place in the hotel room included the following. COUSIN advised the UC that PERRY was his "peoples." The UC affirmatively acknowledged what COUSIN had said and then asked PERRY if COUSIN had advised him of "what [was] going on." PERRY replied that he only been "briefly" advised and that he was present to hear the details (relative to the armed robbery) from the UC. The UC then asked PERRY if he hit "licks," which in this context is a street vernacular term commonly used to refer to a home-invasion-style armed robbery. PERRY replied by nodding in the affirmative and stating, "Yeah."

22. The UC then proceeded to explain that he was a disgruntled cocaine courier who works for a Mexican based DTO that was seeking to expand its operations to the New England area. The UC explained that the DTO maintained stash houses containing "pure cocaine." The UC then stated that he was responsible for transporting two (2) "kilos" of cocaine for the DTO. PERRY affirmatively acknowledged that he understood what the UC had said by stating, "Okay". The UC added that every time he collected cocaine at a stash house he observed at least ten (10) "kilos" of cocaine. The UC stated that every time he entered a stash house the same two guards

were always present, one of whom was always armed with a "pistol on his hip." The UC then explained that when he entered a stash house one of the guards would retrieve two (2) kilos from a back room, hand them to the UC, and then provide the UC with the destination location. The UC asked PERRY if he understood what he had explained thus far, and PERRY affirmatively acknowledged that he did understand by stating, "Mm hmm."

23. The UC went on to explain that the DTO had not provided payment to the UC for the last two (2) times that the UC had transported kilos of cocaine, and indicated that was the reason the UC was looking for someone to rob the stash house. Additionally, the UC advised that this would be the first time he would be conducting a transport for the DTO in this area, and indicated he was also disgruntled because the DTO was making him come all the way to the Boston area. COUSIN then stated to PERRY that this meeting was necessary because, "When it comes to life changing situations, it's that much more in the planning." He continued by stating, "If you ain't planning, you planning to fail." PERRY affirmatively indicated that he agreed.

24. The UC then proceeded to explain that the DTO utilizes vacant, single family houses to stash the cocaine and that the DTO never utilizes the same location more than once as a stash house. The UC also said that they never keep "cash" in the same stash houses used for the cocaine. PERRY affirmatively acknowledged that he understood by stating, "They ain't gonna do that... getting caught with both ain't gonna help no one."

25. PERRY and COUSIN then asked the UC the manner in which he was greeted by the armed guards when the UC arrived at the stash house. Specifically, PERRY asked if the guard who clearly was armed was the guard who answered the door. The UC then explained that the guard who was not visibly armed was the guard who always answered the door, while the visibly armed guard

10

remained immediately behind him. The UC further explained that the same guard who answered the door was the one who would shut the door behind the UC after he entered. PERRY then expressed concern that the visibly armed guard would not be able to be immediately addressed because he was behind the other guard and could very possibly be able to "get the gun" on PERRY and COUSIN. COUSIN agreed and suggested that more planning had to be done in the meantime (prior to the robbery being conducted). COUSIN stated that they (he and PERRY) knew that the target of the robbery was not going to be "crumbs" and the UC reiterated that the target of the robbery would be ten (10) (kilos of cocaine). The UC then discussed the split of the proceeds of the robbery with COUSIN and PERRY and suggested that the proceeds be divided "fifty-fifty." COUSIN agreed by stating, "Of course."

26. PERRY then revisited the manner in which the UC entered the stash house. The UC reiterated what he had previously explained and COUSIN and PERRY then began to discuss how they thought the robbery should be conducted. Specifically, COUSIN was of the opinion that they should rob the UC after he came out of the house. COUSIN explained that he would rather have a sure thing, that being the "two bricks" that the UC would be coming out of the house with, than have nothing at all. (In this context "brick" is a street vernacular term commonly used to refer to a kilo of cocaine.) PERRY was of the opinion that they would have to make entry into the house in any event. PERRY then stated, "I'm going in there... I ain't playing."  He added that upon entering the house he wanted immediately to put a "gun" to the first guard's head, take him "hostage," and use him as a "shield" so that the guards could be subdued and would not "let off a shot." COUSIN agreed with the notion of the guards not being able to shoot and stated, "That's

the key to any robbery on earth." PERRY ultimately stated to COUSIN, "If you don't get the situation under control, nothing's going right."

27. The UC then stated that he had one more detail to discuss with COUSIN and PERRY. The UC stated that the kilos were "stamped" with either a little "horse" or a "spider." PERRY then interjected and asked, "Don't serve 'em pure"" The UC affirmatively acknowledged what PERRY had said and stressed that he needed to know that COUSIN and PERRY would not attempt to sell an entire, stamped kilo of cocaine, prior to breaking it down, so as not to raise suspicion as to where the kilogram came from. Both COUSIN and PERRY acknowledged they understood the UC did not want the stamp to be on the streets. COUSIN stated that he would not even be robbing someone of their "drugs" if he did not have the means to distribute them, and PERRY added that his portion of the cocaine was going "straight to the stove," which in this context is a street vernacular phrase commonly used to refer to converting powder cocaine into crack cocaine. COUSIN then asked the UC, "You can turn one into two anyway, right?" The UC affirmatively acknowledged that this was the case, and as he began to talk about the situation when the kilo was broken open, PERRY interjected and asked if the all the "pink," "crystals" and "flake" could be seen inside of the kilo. The UC affirmatively acknowledged this to be the case and added that the cocaine was "fish scale," which in this context is a street vernacular term commonly used to refer to a very high-quality cocaine, usually right off the kilogram, that is uncut. Both COUSIN and PERRY laughed.

28. COUSIN then assured the UC that this type of job would require two (2) members with "machine guns" and a third member with a "handgun." The UC affirmatively acknowledged

what COUSIN had said and advised COUSIN that he would stay in contact until the robbery was to be conducted.

29. The UC maintained contact with COUSIN periodically between January 8, 2020 and January 28, 2020 at COUSIN's phone number, (857) 346-5716. On January 23, 2020, at approximately 8:56 p.m., the UC placed a recorded phone call to COUSIN at phone number (857) 346-5716. The UC advised COUSIN that the he had "received word" and that the robbery was set to take place on the upcoming Tuesday (January 28, 2020). The UC told COUSIN that he was notifying him so that he (COUSIN) could get all of his "peoples ready." COUSIN affirmatively acknowledged that he understood and told the UC that he did not have to "say that" (over the phone). The UC affirmatively acknowledged that he understood and told COUSIN that he would most likely be arriving (in Boston) late on the following Monday night, and that the UC would contact COUSIN when he arrived. COUSIN told the UC to "make sure" the UC contacted him and the UC agreed. The phone call was then concluded.

30. On January 27, 2020, the UC initiated recorded cell phone text message communication with COUSIN at phone number (857) 346-5716 to advise him that the UC would be arriving later that day. At approximately 10:18 p.m. the UC placed a recorded phone call to COUSIN at that number to advise him that he had arrived (in Boston). COUSIN asked the UC if he wanted to meet. The UC said that he could not meet at that time but would meet with COUSIN and his associates the following morning, after the UC had acquired a storage unit. The UC further told COUSIN that the target of the robbery was in the East Boston area and that it would occur by noon on the following day. COUSIN stressed that he wanted to meet prior to going to the storage unit. The

13

UC agreed and advised that he would be in contact with COUSIN on the following morning. COUSIN affirmatively acknowledged that he understood and the phone call was then concluded.

### Arrest of COUSIN and PERRY

31. On January 28, 2020, at approximately 11:17 a.m., the CW received an impromptu phone call from COUSIN, who was seeking the CW's location. The CW placed COUSIN on speakerphone so that the UC could also communicate with COUSIN. COUSIN asked the UC where he wanted to meet, and the UC suggested that COUSIN meet with him and the CW in the parking lot of the Hilton Garden Inn, located at 100 Boardman Street, Boston, MA. COUSIN agreed and asked the UC how long it would be before the UC arrived. The UC told COUSIN he would be there in approximately fifteen minutes.

32. At approximately 11:30 a.m. the UC and the CW arrived at the Hilton Garden Inn parking lot in an undercover vehicle ("UCV") being operated by the UC. At approximately 11:36 a.m., the CW received a phone call from COUSIN, which was recorded. COUSIN advised that he had previously arrived at the Hilton Garden Inn. COUSIN said that he had observed law enforcement at that location outside of the parking lot and did not want to meet there. COUSIN further advised that he did not want to meet in a public place and asked the UC to pick a new meeting location. The UC affirmatively acknowledged that he understood the concern and advised COUSIN that he would call him back.

33. At approximately 11:46 a.m. the UC placed a recorded phone call to COUSIN and suggested that they meet at the CubeSmart Self Storage, located at 150 McClellan Highway, Boston, MA 02128. COUSIN was initially reluctant to meet at that location but eventually agreed to meet the UC and the CW there and asked the UC to provide him with the address. The UC agreed and the phone

14

call was then concluded. The UC subsequently provided COUSIN with the address by means of

a text message, to which COUSIN responded affirmatively. The cell phone text message and call

log communication is listed as follows, chronologically and in verbatim form:

| Date | Time | Number | Type | Direction | Content | Min. |
|------|------|--------|------|-----------|---------|------|
| 2020/01/28 | 11:46:35 AM EST | 857-346-5716 | Call | Outgoing | | 3:39 |
| 2020/01/28 | 11:48:58 AM EST | 857-346-5716 | SMS | Outgoing | 150 McClellan Hwy Its the Cube Smart Herman | |
| 2020/01/28 | 11:51:13 AM EST | 857-346-5716 | SMS | Outgoing | Hermano | |
| 2020/01/28 | 11:51:29 AM EST | 857-346-5716 | SMS | Incoming | Got it | |
| 2020/01/28 | 11:51:55 AM EST | 857-346-5716 | SMS | Outgoing | 👊☐ | |
| 2020/01/28 | 11:52:05 AM EST | 857-346-5716 | SMS | Incoming | On way | |

34. The UC and the CW then departed from the Hilton Garden Inn and traveled to the CubeSmart Self

Storage. At approximately 12:08 p.m. the UC received a phone call from COUSIN, who told the

UC that he was approximately ten (10) minutes away. At approximately 12:14 p.m. the UC

received another phone call from COUSIN, advising the UC that he had arrived and wanted to

know the UC's location. The UC told COUSIN that he and the CW were inside of the gated area

and instructed COUSIN to park his car inside of the gated area as well. A blue Honda Civic,

bearing MA license number 634-AM1, then pulled into the gated area of the storage units. The

UC and the CW exited the UCV and COUSIN parked his vehicle directly behind the UCV.

COUSIN and PERRY exited COUSIN'S vehicle and made contact with the UC and the CW.

35. COUSIN again explained that he and PERRY were at the Hilton Garden Inn and that they had

observed law enforcement on the street, in front of the hotel. COUSIN specifically described a

black Ford SUV with dark tinted windows with the exhaust pipes on. COUSIN further stated that

he observed "white" individuals inside the Ford SUV and that it was parked specifically to face the parking lot (where the UC and the CW were parked). COUSIN added that, after notifying the UC, he and PERRY had returned to the area and observed that the law enforcement vehicle was no longer present. The UC thanked COUSIN for warning him of the presence of law enforcement.

36. The UC then asked COUSIN and PERRY if they were "ready" and had their "guns and everything." COUSIN and PERRY responded affirmatively and stated that they did not carry their wallets or anything else with them when they were doing this type of business. The UC then asked COUSIN if it would just be COUSIN and PERRY (conducting the robbery) and COUSIN answered that he had one more crew member, who was the "driver." COUSIN further advised that the driver was in possession of the firearms, and PERRY added that the driver was "right around the corner." The UC then stated that the driver needed to come meet at that location so that everyone could be together when the UC received the phone call with the location of the target of the robbery. The UC added that he had also rented a van that COUSIN and his crew members could use to drive to the target location, if they wanted to use it. COUSIN and PERRY were both reluctant to have the driver meet them at the CubeSmart. COUSIN stated that he would take the van, PERRY would follow him, and he would meet with his driver and wait for the UC to call them and provide them with the target location. The UC disagreed and remained adamant that the driver needed to come meet with them at the CubeSmart prior to receiving the phone call.

37. PERRY then suggested that all parties enter the UCV because it was cold. All parties then entered the UCV, where COUSIN and PERRY continued to dispute the UC's idea of having the driver come to meet with them at the CubeSmart. The UC maintained his point and PERRY then asked the UC what type of building the target location was. The UC stated that the target location would

be a house and that it would have the same two "dudes" (armed guards) as had been discussed at

the meeting on January 8, 2020. PERRY affirmatively acknowledged that he understood and then

changed the subject, nonchalantly commenting that he liked the UC's beanie hat. PERRY then

asked the UC why it looked like it had a brim inside of it and wanted the UC to provide him with

the beanie so that he could look at it. The UC then removed the beanie from his head but refused

to provide it to PERRY, who was displeased. PERRY then signaled to COUSIN to exit the

vehicle, and they both exited the UCV. The UC also exited the UCV stated that he just wanted to

make sure they were "cool." PERRY stated "yeah" and the UC then provided COUSIN and

PERRY with an opportunity to abandon the conspiracy by stating, "I just want you guys to be cool

with it, and if you not, then you not. You know, like? It's up to guys…" COUSIN then replied,

"We cool" and continued talking to PERRY at a level inaudible to the UC and the CW as they

returned to their vehicle.   COUSIN and PERRY then departed from the CubeSmart at

approximately 12:23 p.m.

38. At approximately 12:26 p.m. the UC placed a recorded phone call to COUSIN to ask if they were

"good." COUSIN then stated that he was going to get the third member of his crew and would be

returning shortly. The UC stated, "If you all still with it, grab your mans and come back. If not,

it's all good, you feel me?" COUSIN affirmatively acknowledged that he understood and stated,

"Yeah."

39. At approximately 12:34 p.m. the UC received a phone call from COUSIN, who told the UC that

he was on his way back to the UC's location. At approximately 12:53 p.m. the UC observed

COUSIN and PERRY approaching the UCV on foot. The UC and CW exited the UCV and made

contact with COUSIN and PERRY. COUSIN asked which storage unit the UC had rented. The

UC then proceeded to open one of the storage units and indicated to COUSIN and PERRY that they could come back to leave the UC's proceeds of the robbery there in the event that the UC was split apart from the group. COUSIN and PERRY affirmatively acknowledged that they understood and asked if extra copies of the storage unit lock keys were needed. The UC stated that was not necessary because he already had two sets of keys, one of which would be provided to COUSIN and PERRY. The UC then asked COUSIN if he had brought the third member of his crew, and COUSIN advised that he did not. He stated that since there was too much "confusion" they (COUSIN and PERRY) no longer needed the third member.

40. PERRY then returned to the subject of the UC's beanie and said, "We out here about to do crime... this is some real shit. Now, I'm looking at you, a regular skully is flat!" PERRY then reached out with his pointer finger and pressed the emblem of the UC's beanie as he pointed out to COUSIN and the CW that the UC's beanie had a "bulge." PERRY asked, "What the fuck is inside?" The UC stated that it was just the emblem. PERRY continued to express concern about trust issues because the UC had been reluctant to provide him with the beanie when they had met earlier. PERRY then explained his concern by saying that he had just done "some shit with somebody" whom he had provided with a "burner." PERRY stated that the individual "called the police" on him, while PERRY was "in the house doing it." The UC indicated that he understood PERRY'S concern and assured both PERRY and COUSIN that everything was good.

41. The UC, the CW, COUSIN and PERRY all then entered the storage unit that the UC had previously opened. COUSIN said that he and PERRY had "bad nerves," especially because of his earlier observation of the law enforcement vehicle (at the Hilton Garden Inn). The UC affirmatively acknowledged that he understood and stated that everyone had "nerves." COUSIN

and PERRY then proceeded to unzip their jackets, unbuckle their pants and remove them below their waist lines, as they lifted their shirts to show the UC that they did not have anything on them (referring to "wires" or recording devices). COUSIN stated that was what was supposed to be done "as men," and PERRY added that he just wanted to "make it home" and "benefit" from the robbery. As a show of good faith, the UC then proceeded to do the same, showing that he did not have anything on him either. COUSIN and PERRY observed the UC's show of good faith and the UC then proceeded to turn the front part of his beanie inside out, so that COUSIN and PERRY could see there was nothing behind it. COUSIN and PERRY observed and affirmatively acknowledged there was nothing concealed in the UC's beanie. COUSIN stated that made him feel "so much better." PERRY agreed with COUSIN and stated, "I ain't going nowhere. We'll get the job done."

42. The UC, the CW, COUSIN and PERRY all then exited the storage unit and the UC again asked COUSIN if the third member of his crew was coming to meet at the storage unit. At approximately 1:03 p.m. PERRY stepped away and immediately returned while on a phone call via Bluetooth with someone, stating, "We just waitin' on the call. It depends on what you wanna do. You wanna stay there where you at, or, how you wanna do it?" PERRY then stated to COUSIN, "Trick gotta go! I gotta pick Trick up!" as he stayed on the line. PERRY returned to his phone conversation and stated, "I'm just gonna grab you, you heard?" and then ended the phone conversation. COUSIN asked PERRY what "Trick" had said and PERRY replied, "We just gotta grab him." COUSIN and PERRY then walked toward the secondary UCV, which had been staged prior to the meeting, as they continued their conversation, which was inaudible to the UC and CW. The UC then closed and locked the storage unit and turned his attention back to COUSIN and PERRY.

COUSIN was now on his phone, but the conversation was still inaudible as COUSIN and PERRY were too far from the UC.  PERRY then shouted to the UC that he and COUSIN would be right back as they began to attempt to enter the secondary UCV.

43. At approximately 1:06 p.m. the UC provided the predetermined arrest signal, and both COUSIN and PERRY were arrested and taken into custody by members of the ATF Special Response Team. Agents recovered the COUSIN PHONE from COUSIN incident to his arrest.

## PROBABLE CAUSE TO BELIEVE THAT THE EQUIPMENT CONTAINS EVIDENCE, FRUITS, AND INSTRUMENTALITIES

44. As discussed above, the equipment is currently being stored by investigators at their facilities as described in Attachment A.  From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession.

45. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computer equipment to carry out, communicate about, and store records regarding their daily activities.  These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

46. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Apple iPhones, such as the equipment seized from COUSIN, are a type of smartphone. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

47. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

48. As described above, the investigation has uncovered evidence that COUSIN used the equipment during the commission of the offenses to send or receive relevant text messages and telephone calls with the CW and others.

49. Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

   a.      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

   b.      Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained

in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## CONCLUSION

50. Based on the foregoing, I submit there is probable cause to believe that COUSIN and PERRY have committed violations of federal laws, including specifically 18 U.S.C. § 1951 (conspiracy to commit robbery affecting commerce) and 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A)(ii) (conspiracy to possess with intent to distribute 5 kilograms or more of cocaine).

51. Based on the information described above, I submit there is probable cause to believe that the evidence, fruits, and instrumentalities of the above crimes, as described in Attachment B, are contained within the equipment described in Attachment A.

ROBERT JACOBSEN
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me this
31st day of January 2020.

HON MARIANNE B. BOWLER
United States Magistrate Judge